IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALICIA BRYANT, in Her Capacity as the Personal Representative of the Estate of Jonathan Bryant, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | 2:18-CV-122-BR |
| DANNY GILLEM, | § § | |
| Defendant. | § § | |

## OPINION AND ORDER

Today the Court must decide if Plaintiff Alicia Bryant ("Plaintiff")[1] has met her burden to create a genuine issue of material fact that Defendant police officer Danny Gillem's ("Gillem") actions were *both* intentionally applied *and* objectively unreasonable under clearly established law during Gillem's seizure of Plaintiff's deceased husband, Jonathan Bryant ("Bryant"). Gillem – following a high-speed car chase in pursuit of Bryant – drew his firearm, pointed it at Bryant, failed to holster the weapon while attempting to handcuff Bryant, and subsequently discharged the firearm, striking Bryant in the shoulder with the bullet. After exiting the vehicle, Bryant fully complied with all officer orders and did not resist arrest. These facts are undisputed.

Plaintiff's burden arises because of Gillem's assertion of qualified immunity in relation to that incident. Gillem filed a Motion for Summary Judgment, with a brief in support and appendix of evidence. [ECF Nos. 49, 50, 51, respectively]. Plaintiff filed a Response to the Motion, along

---

[1] The Court notes that Plaintiff represents the interests of her husband after his death. On November 13, 2018, this Court entered an Order substituting Alicia Bryant—the Personal Representative of the Estate of Jonathan Bryant—as Plaintiff in this action for all purposes. [ECF No. 20]. Bryant passed away in Florida due to an incident unrelated to this case. *See* [ECF No. 15].

with an objection[2] and appendix of evidence, [ECF Nos. 57, 58, respectively], to which Gillem

filed a Reply, [ECF No. 59]. This Court has reviewed all the summary judgment evidence

identified in this paragraph and all the arguments of the parties set forth in these documents. For

the reasons explained below, the Court OVERRULES Plaintiff's Objection to parts of Gillem's

summary judgment evidence, GRANTS the Motion for Summary Judgment, and DISMISSES this

action with prejudice.[3]

## I. <u>FACTUAL EVIDENCE BEFORE THE COURT</u>

On August 24, 2016, 100th District Attorney Investigator Mike Chapman ("Officer

Chapman") was working stationary radar on U.S. Highway 287 ("Highway 287") in the City of

Childress, Texas. [ECF No. 51 at 42][4]. At approximately 2:27 p.m. on that day, Officer Chapman

clocked a grey Ford Explorer traveling east on Highway 287[5] at 45-m.p.h. in a 35-m.p.h. zone. *Id.*

at 42, 64. Officer Chapman activated the emergency lighting of his patrol vehicle and attempted

to pull the Ford Explorer over. *Id.* at 42. Bryant – the driver of the Ford Explorer – initially signaled

his intent to pull over, but then quickly accelerated. *Id.* Officer Chapman activated his emergency

siren, initiated a pursuit, notified the Childress County Sheriff's Office of the pursuit, and

requested backup. *Id.* at 64. Gillem – Chief Deputy of the Childress County Sheriff's Office –

responded to the request for backup and joined Officer Chapman's pursuit of Bryant. *Id.* at 15, 40.

---

[2] The objection is found in footnote 1 of Plaintiff's motion.

[3] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). *See* [ECF Nos. 30, 31].

[4] GILLEM MOTION FOR SUMMARY JUDGMENT APPENDIX (referenced throughout this Opinion and Order by ECF docket entry number and specific page). References to the dash camera video recordings (of Officer Chapman and Gillem) cite to the indicated location within the appendix where the videos were attached and include only general time references; however, the Court lists events from the video recordings in a sequential fashion as they occurred.

[5] At the location of the traffic stop, Highway 287 is a four-lane divided highway with a grassy median.

What follows is a general description of the pursuit recorded by Officer Chapman's dash camera. *See generally id.* at 64.[6] The recording begins with Officer Chapman initiating a traffic stop. After Bryant initially signaled to pull over and stop, Bryant accelerated away from Officer Chapman at a high rate of speed. Officer Chapman immediately advised dispatch that he was in pursuit of a grey Ford Explorer, that he had attempted to pull the suspect vehicle over, and that the suspect vehicle was travelling in excess of 115-m.p.h. As the pursuit began, Bryant swerved in and out of traffic, passing two semi-trucks on the right using the improved shoulder of the road at a high rate of speed. At the four-minute and thirty-second mark, Bryant nearly ran another vehicle off of the road. Officer Chapman advised dispatch that he had observed the suspect vehicle intentionally attempt to run another motorist off the road. Childress County Sheriff Michael Pigg ("Sheriff Pigg") stated on the radio that the suspect vehicle was a danger to the public. Officer Chapman responded, "I can't get close enough to him Sheriff. I'm trying."

Five minutes into the recording, Gillem can be seen on the far-left side of Highway 287 with patrol vehicle lights flashing, joining the pursuit. Directly after Gillem joined the pursuit, Bryant almost ran another motorist off of the road. A mere twenty-five seconds later, he closely tailed the bumper of another motorist, forcing that vehicle to switch lanes. At the seven-minute and eight-second mark, Officer Chapman advised dispatch that the driver of the suspect vehicle appeared to be a black male. Bryant straddled multiple lanes during the continued pursuit, weaving back and forth to prevent Officer Chapman from passing or coming alongside him. At the eight-minute and forty-second mark, Bryant ran multiple motorists off of the road. Near the nine-minute and fifty-second mark, he almost ran into a semi-truck.

---

[6] Officer Chapman's dash camera video recording is approximately twenty-six and one-half minutes in length. The facts stated herein are taken from this video footage.

At the eleven-minute and ten-second mark, as the pursuit neared Goodlett, Texas, Gillem asked Officer Chapman over the radio whether he was able to take a shot. Approximately eleven minutes and fifteen seconds into the pursuit, Officer Chapman fired multiple shots at the suspect vehicle for the first time. Gillem immediately advised dispatch that "[s]hots are being fired!" Officer Chapman fired upon the suspect vehicle for a second time at the eleven-minute and forty-five-second mark, and for a third time at the twelve-minute and fifteen-second mark. Fifteen seconds after the third shooting, Bryant swerved out from behind another motorist onto the middle grass median of Highway 287 in order to avoid a spike strip.

At the thirteen-minute and forty-five-second mark, as the pursuit approached Quanah, Texas, Officer Chapman fired upon the suspect vehicle for a fourth and final time. Bryant immediately slammed on his breaks and began to pull over to the right side of Highway 287. Officer Chapman then drove his patrol vehicle into the rear of the suspect vehicle, forcing it off of the road where it came to a complete stop near a tree line in up-to-knee-length grass. Police sirens blared loudly in the background.

At the fourteen-minute mark, two men emerged from the driver and front passenger doors of the suspect vehicle with their hands raised. Both men went to the ground within seconds, laying down with arms and legs outstretched, while law enforcement simultaneously ordered them to the ground. At the fourteen-minute and seven-second mark, Officer Chapman appeared on screen with a pistol in both hands and walked to secure the individual on the passenger side of the suspect vehicle.[7] Another police officer also had his weapon drawn and stood between Bryant and the passenger. The events that followed are at the heart of the Plaintiff's claims.

---

[7] Bryant's brother, Justin Bryant, was a passenger in the vehicle. He was arrested at the scene without incident by Officer Chapman.

Fourteen minutes and twelve seconds into the pursuit, Gillem appeared on screen with a pistol in his right hand and ran to secure Bryant on the driver's side of the suspect vehicle.[8] As he neared the suspect vehicle, Gillem held his pistol with both hands and pointed it at Bryant. Bryant immediately placed both of his arms straight behind his back. Gillem then transferred the pistol to his left hand, knelt next to Bryant, and kneed Bryant in the back with his right knee. After his right knee came down, Gillem reached in with his right hand for Bryant's hands; a single shot was simultaneously fired from the pistol in Gillem's left hand into Bryant's left shoulder. In total, five seconds elapsed from the time that Gillem drew his gun until the point at which he fired the single shot into Bryant.

After the gun discharged, Gillem immediately pointed the pistol away from Bryant. He subsequently holstered his pistol on the right side of his hip and requested assistance. Another officer came to assist Gillem and handcuffed Bryant, and Gillem requested medical assistance and the Texas Rangers.[9] At the fourteen-minute and fifty-eight-second mark, an officer asked, "Where'd the gunshot come from?" Gillem responded, "Me, I shot him." Thereafter he helped Bryant sit up. Bryant received medical care on site and was helped to his feet. At the twenty-three minute and thirteen-second mark, Bryant disappeared from camera view and the video recording ended shortly thereafter.[10]

---

[8] Gillem's dash camera video also shows Gillem exit his vehicle and draw his firearm, but Gillem pulled his vehicle in front of the suspect vehicle and the other video footage does not assist the Court in seeing what happened next; however, the audio does provide some guidance as to Gillem's intent. *See generally id.* at 63.

[9] Gillem's dash camera video indicates Gillem yelled, "Hey, get me an ambulance! He's shot. I shot him. Get an ambulance. Shot him in the arm. Get an ambulance." *Id.* at 63, fourteen-minute and twelve-second mark. Over the course of the next few minutes, Gillem stated, among other things, "I'm not going to let you die," "I'm not gonna let you die," and "see if there's a ranger here that [can] come this way." In the final thirty-seconds of the recording, Gillem stated, "I messed up. I messed up. I had him on the ground, and I went and got his arm, and as soon as I did, 'pow!' " *Id.*

[10] Mr. Bryant was subsequently treated and survived the shooting.

That same day, the Texas Rangers, at the request of Sheriff Pigg, initiated an investigation regarding the shooting of Bryant. *Id.* at 38. As part of their investigation, the Texas Rangers created an investigative report documenting their interviews with numerous witnesses, including but not limited to Officer Chapman and Gillem, and their collection and review of other evidence regarding the shooting. *See id.* at 38-62. During his interview, Officer Chapman stated in part:

> I then utilized my marked patrol unit to conduct a pursuit intervention technique to disable the vehicle and take the subject driving into custody. The vehicle came to a rest on the south side of [Highway] 287 in the grass bar ditch. At this point, two (2) suspects exited the vehicle and complied with commands to get on the ground. I approached the passenger male who was lying on the ground (face down) holstered my firearm and placed handcuffs on the subject without further incident. As I was placing handcuffs on the subject I heard a gunshot from what appeared to be the driver's side of the suspect vehicle. I walked over to check and see where the gunshot came from and observed blood on the driver's left shoulder. Chief Deputy Gillem stated to me that he accidentally shot the driver while he was attempting to arrest him.

*Id.* at 43. During his interview, Gillem stated in part:

> The violator's vehicle slowed down and pulled to the right hand side of the roadway. At that time, Officer Chapman hit the rear portion of the violator's vehicle and pushed the vehicle to the right of the roadway in the barrow ditch. I slowed down quickly and positioned my vehicle in the barrow ditch just east of the violator's vehicle. I exited my vehicle and drew my firearm (Glock Model 17 9mm [c]aliber pistol) which was secured by a right handed holster on my duty belt and approached [the] violator's vehicle. Officer Chapman was located at the rear of the violator's vehicle with his firearm drawn in the direction of the driver, and I observed a black male lying in a prone position on the ground. I attempted [to] gain control of his right arm and grabbed his right arm with my right hand. When I grabbed his arm and moved it behind his back I discharged my firearm which was in my left hand and struck the violator in the left shoulder area. I secured my firearm in my holster. The violator was handcuffed by [another officer] and positioned upright but seated and emergency personnel was contacted to render care to the subject.

*Id.* at 40-41. The investigation was closed after a grand jury returned a no bill. *Id.* at 38-39.[11]

---

[11] A "no bill" is "[a] grand jury's notation that insufficient evidence exists for an indictment on a criminal charge." NO BILL, Black's Law Dictionary (11th ed. 2019).

On February 11, 2019, Texas Ranger Ricky Brown ("Ranger Brown") – the lead investigator of the shooting – was deposed in connection to this case. *See* [ECF No. 51 at 18-37]; *see also* [ECF No. 58 at 55-83][12]. On direct examination, Ranger Brown testified that he believed the shooting resulted from a "sympathetic or a reflexive squeeze" by Gillem's left hand as he reached towards Bryant with his right hand. [ECF No. 58 at 27]. Ranger Brown described a "sympathetic reflex" as "your muscles reflexing in conjunction with one another." *Id.* at 29. Ranger Brown further testified that he believed the shooting was an unintentional accident, and that the highly stressful pursuit impacted the accidental discharge. *Id.* at 29-31. On cross-examination, Ranger Brown acknowledged, among other things, that officers are trained to holster their weapons prior to attempting to secure suspects, that officers are trained to index their trigger fingers,[13] that Gillem did not follow his training as to holstering and indexing when he attempted to secure Bryant, and that Ranger Brown did not ask Gillem why he failed to do so. *Id.* at 68, 77-78.

Gillem was also deposed. *See id.* at 1-54. During the course of his deposition, Gillem testified that upon his initial approach of the suspect vehicle he could not clearly see Bryant's hands because he was laying in tall grass, that he thought he had holstered his gun prior to attempting to secure Bryant, that he did not intend to pull the trigger of his firearm, and that he accidentally shot Bryant. *Id.* at 26-29, 33, 38, 45-47. Gillem also stated he never intended to put his finger on the trigger of his firearm because he was unaware it was not holstered when the gun transferred to his left hand. *Id.* at 32. However, he acknowledged, among other things, that he did not see any weapons in Bryant's hands when he "got up on him" and "got close enough" to him,

---

[12] PLAINTIFF'S APPENDIX TO THE RESPONSE TO GILLEM'S MOTION FOR SUMMARY JUDGMENT (referenced throughout this Opinion and Order by ECF docket entry number and specific page).

[13] "Indexing is the technique by which officers hold a hand gun safely by keeping the trigger finger outside the trigger guard unless and until the officer decides to shoot." *Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, at *28 (S.D. Tex. Sept. 29, 2007).

that Bryant fully complied with his commands and did not resist arrest, that he had received training about holstering his weapon, that he had received training about trigger and muzzle discipline,[14] and that he had made a mistake. *Id.* at 9, 26-30, 38, 49, 51.

Gillem subsequently filed a declaration in conjunction with his motion for summary judgment in which he provided a general description of the pursuit and shooting of Bryant. *See* [ECF No. 51 at 15-17]. According to the declaration, on August 24, 2016, Gillem "heard radio traffic regarding a pursuit occurring on Highway 287." *Id.* at 15. Gillem "followed the radio traffic and was en route for assistance near [Highway] 287, when [he] observed Officer Chapman traveling east with his lights activated." *Id.* Gillem quickly "followed and positioned [his] vehicle behind that of Officer Chapman." *Id.* Gillem observed the suspect vehicle drive at "extremely high rates of speed, far in excess of 100 mph through traffic in the middle of the afternoon" and "weave[] in and out of traffic at high rates of speed, causing other vehicles to run off the road." *Id.* Just before entering the city limits of Quanah, Texas, Gillem observed "Officer Chapman hit [the suspect vehicle] with his, causing it to push further from the roadway into the barrow ditch." *Id.*

At that time, Gillem "slowed down and positioned [his] vehicle on the driver's side of [the suspect] vehicle." *Id.* He then "drew [his] weapon." *Id.* Upon exiting his own vehicle, Gillem observed Bryant "exit the [suspect] vehicle with his hands in the air" and "la[y] down in the grass." *Id.* The declaration indicates that the grass was "high and prohibited [Gillem] from clearly seeing [Bryant's] hands as [he] approached" the suspect vehicle. It also indicates that Gillem "kept [his] weapon drawn because [he] could not see [Bryant] clearly due to the grass." *Id.*

---

[14] The term "muzzle" is defined as "the discharging end of a weapon." Merriam-Webster's Collegiate Dictionary 820 (11th ed. 2005). "Muzzle discipline" requires pointing the muzzle of one's firearm in a safe direction. *See* [ECF No. 58 at 9]. The term "trigger" is defined as "the part of the action moved by the finger to fire a gun." Merriam-Webster's Collegiate Dictionary 1337 (11th ed. 2005). "Trigger discipline" requires keeping one's finger off of the trigger until ready to fire. *See* [ECF No. 58 at 9].

Upon reaching Bryant, Gillem "knelt down to secure [him]." *Id.* In quick succession Gillem "moved [his] weapon from [his] right hand to [his] left hand" and "kneeled down to grab [Bryant's] right arm with [his] right hand." *Id.* at 15-16. "As [Gillem] kneeled down and began to reach for [Bryant's] arm, [his] weapon discharged, shooting Bryant in the shoulder." *Id.* at 16. Gillem declared that "[t]he discharge was purely an accident," that "[he] did not intend to discharge [his] weapon at any time," and that "[he] did not even realize [he] was holding the gun in [his] left hand as [he] kneeled down and accidentally discharged the gun." *Id.* Following the shooting, Gillem "remained with Bryant and eventually help[ed] sit him up as [they] waited for paramedics to arrive." *Id.* Gillem declared under penalty of perjury that the facts stated in his declaration were "true and correct." *Id.* at 17.

Additionally, Gillem filed a declaration in which Margo Frasier, the former Sheriff of Travis County, Texas, provided an opinion regarding the actions taken by Gillem at the scene of the shooting. *See id.* at 1-14. She indicated that Gillem's actions were objectively reasonable under the circumstances and clearly established law. *Id.*

## II.  <u>PLAINTIFF'S CLAIM FOR RELIEF AGAINST GILLEM</u>

Plaintiff makes one claim in her Second Amended Complaint against Gillem under 42 U.S.C. § 1983: the use of excessive force during a seizure. *See* [ECF No. 47 at ¶¶ 24-34]. That claim arises under the Fourth Amendment.

## III.  <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A qualified immunity defense, however, alters the usual summary judgment burden of proof, such that governmental employees need only assert the defense in good faith, putting forth no evidence, to shift the burden to the non-movant to show the defense does not apply. *Davalos v. Johns*, No. 3:11-CV-0222-P, 2013 WL 1820313, at *3-4 (N.D. Tex. Apr. 30, 2013) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).[15] The non-movant must demonstrate how specific evidence in the record, and all reasonable inferences therefrom, viewed by the court in a light most favorable to the non-movant, presents a genuine, material fact dispute for trial regarding all essential elements of the claim. *Id.* at *4. "[C]onclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *Id.* (quoting *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)). A plaintiff's failure to produce proof as to *any* essential element of the claim renders all other facts regarding that claim immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F. Supp. 2d 613, 623 (N.D. Tex. 2007). Summary judgment is mandatory as to the claim in question if a plaintiff fails to meet this burden. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

Qualified immunity is a defense that protects government officials from suit when they exercise the discretionary functions of their office. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). In order to overcome a defense of qualified immunity, a plaintiff must establish that: (1) "the official violated a statutory or constitutional right" and (2) "the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)

---

[15] Gillem has asserted the defense of qualified immunity in his motion for summary judgment. Therefore, the burden has shifted to Plaintiff to demonstrate that he is *not* entitled to qualified immunity.

(quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). A plaintiff must demonstrate that the defendant's conduct was objectively unreasonable in light of the legal rules clearly established at the time of his actions. *Thomas v. City of Dallas*, 175 F.3d 358, 364 (5th Cir. 1999). Conclusory allegations of wrongdoing will not satisfy these requirements. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). A court may examine these factors in any order. *Pearson v. Callahan*, 555 U.S. 223 (2009), *overruling in part Saucier v. Katz*, 553 U.S. 194 (2001). It is a plaintiff's burden to present evidence that a defendant is not entitled to qualified immunity when the defense is raised. *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001).

Claims of qualified immunity are not judged on twenty-twenty hindsight, or in light of knowledge ascertained after an event, but by looking through the eyes of the public official, considering what that official knew about the situation at the relevant time. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Poole v. City of Shreveport*, 691 F.3d 624, 630 (5th Cir. 2012). When properly applied, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 34l (1986). "[P]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (emphasis and citation omitted). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citing *Malley*, 475 U.S. at 341).

## IV. <u>ANALYSIS</u>

The Court's analysis is divided in two parts. First, the Court addresses Plaintiff's Objection to portions of Gillem's appendix of evidence. Second, the Court addresses whether Plaintiff met

her burden to establish a material fact question exists as to each element of her claim, sufficient to overcome Gillem's qualified immunity defense. To fulfill this burden, Plaintiff must provide evidence of a fact question that Gillem's *intentional* acts were objectively unreasonable in light of clearly established law. The Court stresses that this does not involve an analysis of Gillem's subjective intent to act in an objectively unreasonable fashion contrary to clearly established law, but rather simply requires some *intentional* behavior, rather than purely accidental behavior, to be objectively unreasonable.

## A.  OBJECTION TO EVIDENCE

Plaintiff's only objection concerns certain testimony of Ranger Brown. Specifically, Plaintiff "objects to the admissibility of Ranger Brown's testimony regarding Gillem's alleged mental and/or emotional states and the alleged effect on Gillem's response during the encounter with Mr. Bryant, including, but not limited to, any stress-induced 'sympathetic reflex.' " [ECF No. 57 at 13, fn.1]. Plaintiff argues that "such testimony is entirely unsupported by any evidence in the record." *Id.* Construed liberally, this objection also challenges the lack of foundation for this evidence. Ultimately, the Court finds this objection moot, as the "science" of why Gillem pulled the trigger is not relevant to the issue of qualified immunity and the Court does not rely on such evidence in making its determination that the shooting was accidental. To the extent the objection attempts to disallow consideration of Ranger Brown's opinion that the shooting was accidental, the Court overrules the objection.

The essence of Plaintiff's objection is that a portion of Ranger Brown's testimony should be disregarded as lacking foundation and support by any other summary judgment evidence. However, credibility and weight-of the-evidence determinations are for a jury at an eventual trial, not for a judge on summary judgment. *See, e.g.*, *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th

Cir. 2017) ("It is not the role of the court to make credibility determinations, or to weigh evidence when ruling on a motion for summary judgment." (citing *Anderson*, 477 U.S. at 255)). It is Plaintiff's burden to create a material fact question as to the evidence. The Court must consider whether any evidence presented by plaintiff contradicts material testimony by Ranger Brown. Here, it is not specifically how the discharge of the firearm occurred that is relevant to the Court's analysis, but rather if the discharge was the result of an intentional act or the result of an accident. Ranger Brown's experience in investigating police shootings qualifies him to give an opinion not only as to whether the shooting was intentional or accidental, but also as to whether Gillem's behavior was objectively unreasonable. The Court is satisfied that Ranger Brown is qualified to deliver the opinion in question here. The Court is further satisfied that the proper foundation for Ranger Brown's opinion and conclusion is established in his declaration. *See United States v. Wallace*, 961 F. Supp. 969, 976 (N.D. Tex. 1996). The Court therefore overrules Plaintiff's objection.[16]

## B. QUALIFIED IMMUNITY – EXCESSIVE FORCE

At the outset of the Opinion and Order, the Court referenced four specific actions by Gillem during the seizure of Bryant that are at issue in this case: (1) drawing his firearm; (2) pointing the firearm at Bryant until Gillem was close enough to handcuff Bryant; (3) failing to holster his

---

[16] Of course, to the extent that any portion of Ranger Brown's testimony is irrelevant or immaterial to the issues presented on summary judgment, the Court need not and does not consider it. *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991) ("Of course, the court need only concern itself with contradictions of salient facts; factual disputes over issues not germane to the claim are simply irrelevant because they are not outcome determinative. The court may grant a motion [for summary judgment], immaterial factual disputes notwithstanding."). The Court will review all summary judgment evidence in the light most favorable to Plaintiff to determine if Plaintiff meets her burden of creating a material fact question on a Fourth Amendment claim. To the extent that Plaintiff presents evidence that contradicts Ranger's Brown's testimony on a material fact question, the Court will not weigh the evidence to determine if Plaintiff has satisfied her burden. However, this does not prevent the Court from considering this evidence, it merely restricts the Court from weighing this evidence against any evidence that Gillem acted intentionally or whether his behavior was objectively unreasonable.

firearm prior to the attempt to handcuff Bryant; and (4) discharging the firearm, striking Bryant in the shoulder with a bullet. Plaintiff's claim of excessive force during the seizure requires the Court to determine: (1) if these four actions were the result of intentional choices by Gillem or were purely accidental; and (2) if these actions were objectively unreasonable in light of clearly established law and considering all the circumstances. The Court addresses each issue in turn.

"The Fourth Amendment creates a right to be free from excessive force during a seizure." *Trammell v. Fruge*, 868 F.3d 332, 339-340 (5th Cir. 2017) (quoting *Poole*, 691 F.3d at 627). "To bring a [section] 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that she was seized." *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). A "Fourth Amendment seizure" occurs "when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989); *see, e.g.*, *Brendlin v. California*, 551 U.S. 249, 254 (2007) (explaining that a person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied) (emphasis in original).

The plaintiff must then show that she suffered:

(1) "an injury that"

(2) "resulted directly and only from the use of force that was excessive to the need and that"

(3) "the force used was objectively unreasonable."

*Hamilton*, 845 F.3d at 662 (quoting *Flores*, 381 F.3d at 396).

The second and third elements collapse into a single objective-reasonableness inquiry, *see Scott v. Harris*, 550 U.S. 372, 381 (2007), guided by the following *Graham* factors: "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). Whether the force used was excessive or unreasonable depends on the "totality of the circumstances." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

## 1. DRAWING A FIREARM AND POINTING THE FIREARM AT BRYANT – INTENTIONAL ACTS THAT WERE OBJECTIVELY REASONABLE

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham*, 490 U.S. at 395. Accordingly, the Fifth Circuit, in an unpublished opinion, found that "[an officer] still may have violated the Fourth Amendment if he acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it before attempting to handcuff [a suspect]." *Watson*, 532 F. App'x at 458. As clearly outlined in *Watson*, this additional scrutiny of an officer's actions precipitating an "accidental shooting" does not vitiate the legal standard requiring an officer's behavior to be intentional as opposed to accidental. *Id*. In fact, the *Watson* court found qualified immunity applied to the officer's conduct specifically because the only conduct that was not objectively reasonable under the circumstances of the case – the discharge of the firearm at a suspect – was unintentional behavior. *Id*. Although the *Watson* court went on to analyze the failure to holster a firearm under the objective reasonableness standard, it was clear from the court's analysis that the officer *intended* to keep his firearm drawn while handcuffing a potentially non-compliant suspect. *Id*.

In this case, the parties do not dispute that it was entirely appropriate for Gillem to decide to secure Bryant and to draw his pistol before doing so. There seems to be some dispute, however,

as to whether Gillem acted objectively unreasonably in continuing to point the gun at Bryant until he kneeled down beside him and prior to the point he attempted to handcuff Bryant.

As an initial matter, the Court finds that Plaintiff has met her summary judgment burden to identify evidence reasonably showing that Gillem "seized" Bryant prior to the shooting. Officer Chapman's video recording indicates that following the high-speed pursuit, Bryant emerged from the suspect vehicle with his hands raised. [ECF No. 51 at 64]. He went to the ground within seconds, laying down with arms and legs outstretched. As Gillem neared the suspect vehicle, he held his pistol with both hands and pointed it at Bryant. Bryant immediately placed both of his arms straight behind his back. Gillem then transferred the pistol to his left hand, knelt towards Bryant, and kneed Bryant in the back with his right knee. Gillem's video recording indicates that prior to the shooting, Gillem yelled at Bryant, "Put your hands behind your back!" [ECF No. 51 at 63]. The Court, viewing the evidence in the light most favorable to Plaintiff, concludes that a reasonable jury could only find on this record that Gillem by a show of authority restrained Bryant's freedom of movement through means intentionally applied when he pointed his pistol at him, ordered him to place his hands behind his back, and kneed him in the back. The Court now turns to the question of whether Gillem's decision to point his gun at Bryant was objectively reasonable under clearly established law, considering the totality of the circumstances.

The Court notes that the parties dispute whether the law is clearly established that the actions taken by an officer *preceding* an accidental shooting can constitute excessive force under the Fourth Amendment. The Fifth Circuit previously intimated as much in *Watson*, the only analogous Fifth Circuit case upon which Plaintiff relies. *See Watson*, 532 F. App'x at 457-59. But *Watson* – an unpublished non-precedential opinion from 2013 – is insufficient to clearly establish the law for purposes of qualified immunity. *See, e.g.*, *Cooper v. Brown*, 844 F.3d 517, 525 n.8 (5th

Cir. 2016) (explaining that an unpublished Fifth Circuit opinion did not constitute clearly established law for purposes of qualified immunity). This Court has not located any binding United States Supreme Court or Fifth Circuit precedent clearly establishing the proposition of law that an unintentional shooting during an intentional seizure can constitute excessive force if the officer's conduct leading to the accident was objectively unreasonable.[17]

Plaintiff has directed the Court to several cases from other circuits decided prior to August 24, 2016, more-or-less supporting that proposition of law being clearly established. *See Stamps v. Town of Framingham*, 813 F.3d 27, 37 (1st Cir. 2016) ("There is widespread agreement among the circuits that have addressed the issue that a claim is stated under the Fourth Amendment for objectively unreasonable conduct during the effectuation of a seizure that results in the unintentional discharge of an officer's firearm."); *see also In re Estate of Bleck ex rel. Churchill*, 643 F. App'x 754, 756-57 (10th Cir. 2016) (examining the objective reasonableness of an officer's actions in the context of an accidental shooting of a suspect); *Henry v. Purnell*, 652 F.3d 524, 531-33 (4th Cir. 2011) (same); *Tallman v. Elizabethtown Police Dep't*, 167 F. App'x 459, 463-67 (6th Cir. 2006) (same); *Pleasant v. Zamieski*, 895 F.2d 272, 275-77 (6th Cir. 1990) (same); *Torres v. City of Madera*, 524 F.3d 1053, 1056-57 (9th Cir. 2008) (remanding to the district court to address the objective reasonableness of an officer's actions in the context of an accidental shooting of a suspect).[18]

---

[17] It is of course clearly established at a high level of generality that "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395. But that general, broad proposition of law does not directly address the narrow question at issue here, namely, whether it is clearly established law that an unintentional shooting during an intentional seizure can constitute excessive force if the officer's conduct leading to the accident was objectively unreasonable.

[18] Plaintiff has also cited several district court cases in support of her argument that it is clearly established law that an unintentional shooting during an intentional seizure can constitute excessive force if the officer's conduct leading to the accident was objectively unreasonable. However, such cases have little to no bearing on whether law is clearly established for purposes of qualified immunity. *Cf. Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)

Setting aside for the moment that the out-of-circuit cases cited by Plaintiff are non-precedential for this Court, there seems to be uncertainty among the circuits as to whether the aforementioned proposition of law – that unreasonable conduct preceding an accidental shooting can overcome qualified immunity – is clearly established. The Ninth Circuit and Fourth Circuit have *suggested* that it is not clearly established law. *See Powell v. Slemp*, 585 F. App'x 427, 428 (9th Cir. 2014); *see also Culosi v. Bullock*, 596 F.3d 195, 200 (4th Cir. 2010). The Ninth Circuit determined that "[u]nless existing law would have made it 'sufficiently clear' to a reasonable officer in [the officer's] position that attempting to restrain [the suspect] with his gun drawn violated [his] Fourth Amendment rights, [the officer] was entitled to qualified immunity." *Powell*, 585 F. App'x at 428. If no case law exists and the illegality of the officer's actions was not otherwise 'beyond debate,' the officer must prevail on his motion for summary judgment. *Id.* In the Fourth Circuit, application of the qualified immunity defense to turns on this question: "was the shooting death of [the suspect] the result, on the one hand, of an intentional act by [the officer], or, on the other hand, was it the result of a tragic and deeply regrettable, unintentional, accidental, discharge of [the officer's] firearm? … [a] Fourth Amendment seizure occurs 'only when there is a governmental termination of freedom of movement *through means intentionally applied*.' " *Culosi*, 596 F.3d at 200.

The Eleventh Circuit and the Second Circuit have *clearly indicated* that it is not clearly established as to whether officer's actions preceding accidental shooting can also constitute a Fourth Amendment violation. The Eleventh Circuit has stated that "there is no clearly established right to be free from the accidental application of force during arrest, even if that force is deadly."

("[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.").

*See Speight v. Griggs*, 620 F. App'x 806, 809 (11th Cir. 2015) The Second Circuit held that "[t]he [F]ourth [A]mendment . . . only protects individuals against 'unreasonable' seizures, not seizures conducted in a 'negligent' manner. The Supreme Court has not yet extended liability under the [F]ourth [A]mendment to include negligence claims. Only cases involving intentional conduct have been considered by the Supreme Court." *Dodd v. City of Norwich*, 827 F.2d 1, 7-8 (2d Cir. 1987). Finally, the Eighth Circuit declined to address this issue in similar circumstances to the case before the Court. *See McCoy v. City of Monticello*, 342 F.3d 842, 847 n.3 (8th Cir. 2003) ("The shooting was unintentional, thereby raising an interesting question of law: after an intentional Fourth Amendment seizure has occurred, does an accidental shooting implicate the Fourth Amendment? . . . Because we hold [the officer's] post-seizure conduct was objectively reasonable, we need not decide this issue." (citations omitted)).

The Court in this instance, agrees with the position taken by the Eighth Circuit in *McCoy* and finds that although the question remains for the Fifth Circuit whether Gillem's post-seizure conduct preceding the accidental shooting can constitute a Fourth Amendment violation, it is clear his action in pointing the gun at Gillem was not objectively unreasonable in these circumstances. Therefore, the Court declines to decide whether the law is clearly established, and assuming in the Plaintiff's favor that post-seizure actions taken prior to an accidental shooting can expose an officer to liability for purposes of this Opinion and Order, finds that Gillem's post-seizure actions in drawing his gun and pointing it at Bryant were objectively reasonable.

Officer Chapman's video recording indicates that Gillem participated in a dangerous high-speed pursuit of the suspect vehicle. [ECF No. 51 at 64]. During the pursuit, Gillem observed Bryant evade arrest with a vehicle, which placed the lives of other motorists at risk. *See* Tex. Penal Code § 38.04(b)(2)(A); Tex. Transp. Code § 545.421(d). During the pursuit of the vehicle, Officer

Chapman fired several rounds at the fleeing driver in an attempt to gain his compliance in order to pull his vehicle off of the highway. [ECF No. 51 at 64]. After the suspect vehicle came to a stop, Bryant exited it with his hands raised and quickly went to the ground with arms and legs outstretched. As Gillem neared the suspect vehicle, he pointed his pistol at Bryant and ordered him to put his hands behind his back. Bryant immediately complied. (Bryant's hands are visible in the video recording. No weapons of any kind can be seen in them.)

At deposition, Gillem acknowledged that he did not see any weapons in Bryant's hands when he "got up on him" and "got close enough" to him, that Bryant fully complied with his commands, and that Bryant did not resist arrest. Gillem's deposition testimony is consistent with what the video recording shows, namely, that Bryant was not actively resisting arrest or attempting to evade arrest by flight after he exited the vehicle. However, each law enforcement officer on scene in the video had a firearm drawn and pointed at a suspect as they approached the suspect. Further, Plaintiff has not presented any legal authority that an officer acts objectively unreasonably in approaching a suspect with a firearm drawn following a lengthy high-speed chase in a vehicle where shots were fired at the vehicle multiple times, and then the suspect complied with commands. Despite compliance by Bryant after exiting the vehicle, until an officer is close enough to be certain the suspect has no weapons, especially given the very short time frame (approximately five seconds) in which to effectuate the seizure, keeping his gun trained on the suspect is objectively reasonable.

This result is based on the Court's analysis of the objective standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Ramirez v. Knoulton*, 542 F.3d 124, 128–29 (5th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). This

test "allow[s] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Ramirez*, 542 F.3d at 129. The test for reasonableness also must consider "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Graham*, 490 U.S. at 396).

When Gillem drew his firearm and pointed it at Bryant, he was responding to a situation where Bryant had evaded arrest with a motor vehicle for over fourteen minutes, nearly causing potentially fatal car accidents (a threat to other people), failed to stop until the police opened fire on his vehicle (creating a potential danger to other travelers, the police, himself, and his passenger), and Gillem only had seconds to effectuate the arrest. Gillem testified that at the point he was certain Bryant was in compliance with officer orders, he believed he had holstered his firearm before attempting to effectuate the arrest by handcuffing Bryant. [ECF No. 58 at 32–36]. Gillem stated his failure to do so was unintentional. *Id*.

The Court, construing the evidence in the light most favorable to Plaintiff and acknowledging the totality of the circumstances with which Gillem was presented, concludes that Gillem acted objectively reasonably in seizing Bryant by drawing his weapon and pointing it at Bryant until he was close enough to attempt to handcuff Bryant. Assuming for purposes of this Opinion and Order that such actions preceding an accidental shooting may subject an officer to liability under the clearly established law of this circuit, the Court finds Gillem is entitled to qualified immunity based on the objective reasonableness of his actions in these circumstances. The Court therefore grants summary judgment for these intentional acts preceding Gillem's failure to holster his firearm during the seizure of Bryant.

## 2. FAILURE TO HOLSTER AND THE SHOOTING – UNINTENTIONAL ACTS

Gillem argues that he is entitled to qualified immunity regarding failure to holster his firearm and the discharge of his firearm because the summary judgment evidence does not create a genuine issue of material fact supporting the first element – that his actions were intentional – necessary to overcome the defense of qualified immunity. The Court agrees.

The Court finds that Plaintiff has failed to present any competent summary judgment evidence reasonably showing that Gillem's failure to holster his firearm and his discharge of the firearm were intentional acts. A video recording before the Court indicates that as Gillem reached in with his right hand for Bryant's hands, a single shot was simultaneously fired from the pistol in Gillem's left hand into Bryant's left shoulder. [ECF No. 51 at 64]. Such is consistent with Ranger Brown's and Margo Frasier's determinations that the shooting was accidental. *Id.* at 1-14, 38-62. After Gillem shot Bryant, he immediately pointed the pistol away from him. *Id.* at 64. Gillem subsequently holstered the pistol on the right side of his hip and requested assistance. *Id.* Another video recording before the Court indicates that Gillem requested an ambulance for Bryant and told him he was not going to let him die. *Id.* at 63. Gillem also stated to another officer, "I messed up. I messed up. I had him on the ground, and I went and got his arm, and as soon as I did, 'pow!' " *Id.* An investigative report created by the Texas Rangers indicates that following the shooting, "Gillem stated to [Officer Chapman] that he accidentally shot [Bryant] while he was attempting to arrest him." *Id.* at 42-44. At deposition, Gillem stated that he thought he had holstered his gun prior to attempting to secure Bryant, that he did not intend to pull the trigger of his firearm, and that he accidentally shot Bryant. [ECF No. 58 at 1-54]. Consistent with his deposition testimony, Gillem subsequently filed a declaration in which he declared that "[t]he discharge was purely an accident," that "[he] did not intend to discharge [his] weapon at any time," and that "[he] did not

even realize [he] was holding the gun in [his] left hand as [he] kneeled down and accidentally discharged the gun." [ECF 51 No. at 15-17]. The Court, viewing the evidence in the light most favorable to Plaintiff, concludes that a reasonable jury could only find on this record that Gillem did not intend to keep his firearm drawn when attempting to handcuff Bryant, and did not intend to discharge his firearm.

In *Brower*, the United States Supreme Court held that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement … but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower*, 489 U.S. at 596-97. The law of the Fifth Circuit is clear: unintentional behavior does not constitute a Fourth Amendment seizure under *Brower*. *See Gorman v. Sharp*, 892 F.3d 172, 175 (5th Cir. 2018) ("*Brower* and subsequent precedents foreclose liability under the Fourth Amendment in the absence of intentional conduct."); *see also Watson v. Bryant*, 532 F. App'x 453, 457 (5th Cir. 2013) ("The Supreme Court [in *Brower*] held that Fourth Amendment violations occur only through intentional conduct … In the absence of evidence showing that [the officer] intended to use deadly force, we must conclude that the negligent shooting here did not itself violate [the suspect's] Fourth Amendment rights." (citations omitted)); *Baskin v. City of Houston, Mississippi*, 378 F. App'x 417, 418 n.1 (5th Cir. 2010) ("To the extent that a Fourth Amendment claim was raised, any attempt to allege excessive use of force in the course of a negligent seizure is foreclosed by the Supreme Court's decision in *Brower*[.]"). Because there is no evidence on summary judgment to suggest that Gillem intended to maintain control of his weapon while handcuffing Bryant or intended to shoot Bryant, the Court concludes that these negligent acts do not violate Bryant's Fourth Amendment rights.

The Court therefore grants summary judgment to Gillem for failing to holster his firearm and for the discharge of his firearm.[19]

## V.  <u>CONCLUSION</u>

For the above reasons, the Court OVERRULES Plaintiff's objection to parts of Gillem's summary judgment evidence, GRANTS Gillem's Motion for Summary Judgment on the issue of qualified immunity, and DISMISSES this action with prejudice by Judgment filed today.

---

[19] Plaintiff argues that "reasonable jurors could disagree as to whether Gillem intentionally or unintentionally discharged his weapon into Bryant's left shoulder on August 24, 2016, and such fact question should be submitted to the jury for disposition." [ECF No. 57 at 25]. The Court disagrees. As explained previously, Plaintiff has failed to present any competent summary judgment evidence reasonably showing that Gillem intended to shoot Bryant. Plaintiff's argument is apparently rooted in the notion that although "Gillem had the clear opportunity to state that the discharge of his weapon was an 'accident' or 'unintentional' in his thorough and contemporaneous statement to Ranger Brown," he "failed to do so." *Id.* That notion is a nonstarter. First, it is clear from video recordings of the actual shooting that Gillem acknowledged the shooting was an accident: "I messed up. I messed up. I had him on the ground, and I went and got his arm, and as soon as I did, 'pow!' " Second, Gillem has never made a statement that contradicts that the shooting was accidental. Finally, the mere fact that Gillem did not state one way or the other whether the shooting was intentional in his after-the-fact statement to Ranger Brown is insufficient to create a genuine fact dispute regarding his intent. Further, Plaintiff fails to present contradicting information to challenge Gillem's statements that he intended to holster his gun before handcuffing Bryant.

IT IS SO ORDERED.

ENTERED October 31, 2019.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE